Page 102

```
 1   Q. And you told that to Barlow?
 2   A. Dunn.
 3   Q. And I'm asking about Barlow.
 4   A. No. He was just -- he was there. He was one of
 5   them that was there. No, I did not say that to Barlow. I
 6   said that to Dunn, I guess. Well, Dunn and Barlow. All of
 7   the gentlemen that were standing there.
 8   Q. And I want to make sure I have it clear, because I
 9   don't want to confuse Dunn and Barlow.
10         My question was, during that prior incident
11   when they came to arrest Rocket, did you ever tell Barlow
12   who you were?
13   A. No, I did not speak to Barlow.
14   Q. Okay. Now on the arrest date 8/7/04, I understand
15   there was an interaction where Barlow said, "Who are you?"
16   And you said, "I'm Daniel Mahoney and you already know
17   that."
18   A. Uh-huh, that's correct.
19   Q. And why did you say "you already know that"?
20   A. Because I recognized him from a couple weeks
21   earlier.
22   Q. And what made you think that he knew who you were?
23   A. Because he had looked at me right there a few
24   short weeks earlier.
25   Q. But as we sit here today, you agree that you had
```

Page 103

```
 1   never spoken to him on that prior incident?
 2   A. That's correct.
 3   Q. So you'd have to agree that you don't necessarily
 4   know for a fact whether he knew who you were or not,
 5   correct?
 6   A. I suspect that he did know who I was still,
 7   thinking back then.
 8   Q. But you have no firsthand knowledge of him
 9   knowing, such as a communication between the two of you?
10   A. That's correct.
11   Q. What was the next interaction between you and
12   Barlow and/or Andy DeVeaux after he asked you the name and
13   you said you know who I am and that sort of thing, what
14   happened then?
15   A. Then he asked me what was going on, what had went
16   on. And I told him that I wasn't going to go into
17   specifics. I didn't actually say it that way, I said it
18   like a drunk person would.
19   Q. What do you mean you "said it like a drunk person
20   would"?
21   A. I said, "I'm not going to talk to you. What do
22   you need to know?" was my next question. I said, "What do
23   you need to know?"
24   Q. And what did he say?
25   A. He said -- I think he said, "I'm going -- I'm
```

Page 104

```
 1   going to have to detain you until I find out what's going
 2   on."
 3   Q. We're going to have a chance -- we'll go through
 4   the transcript here of what I believe is a transcript of
 5   the arrest. Before we do that, I want to know what -- when
 6   he first approached you and he asked you what your name
 7   was, was he polite?
 8   A. Indifferent.
 9   Q. He was indifferent?
10   A. Yeah. He was aggressive.
11   Q. Was he indifferent or aggressive?
12   A. He was aggressive.
13   Q. Now did you understand by this time that he was
14   responding to a call that had been initiated by your wife?
15   A. Yes, I did.
16   Q. And did you understand that he was responding to a
17   call that you had yelled at her and driven over the bed,
18   did you have that in your mind?
19   A. Yes.
20   Q. So you knew that's why he was there?
21   A. Yeah. But I also knew that was all that happened.
22   Q. And you don't know what other things, or at least
23   at the time you didn't know what other things Melodie might
24   have told him had happened, correct?
25   A. That's correct.
```

Page 105

```
 1   Q. For instance, you didn't know, which we now know
 2   in hindsight, that Melodie had said that he was throwing
 3   rocks at the vehicle, "he" meaning you, am I right?
 4   A. That is correct.
 5   Q. But now in hindsight you know that when he arrived
 6   he was responding to a report of a man yelling, driving
 7   over a bed and throwing rocks at the vehicle, you know
 8   that, that's what he was responding to, correct?
 9   A. In hindsight.
10   Q. And you know in hindsight that he was also
11   responding to -- well, you know in hindsight or not that he
12   was facing a man who was admittedly intoxicated?
13   A. That's correct.
14   Q. Have you read the transcript of the arrest at all?
15   A. Yes, I have.
16   Q. Can you -- I mean, as we know and we'll -- what's
17   that?
18   A. This transcript, is it the same as what I
19   received? I don't know.
20         MR. ROBINSON: If you're going to use it,
21   we're going to have to mark it.
22         MR. BURKE: We can mark it if you want. We
23   don't have to mark it, but --
24         MR. ROBINSON: But I want to know what
25   you're talking to him about, so you --
```

27 (Pages 102 to 105)

Exhibit ___E___
Page __7__ of __11__

Page 114

```
 1  warrant," am I right?
 2     A.  Yes.
 3     Q.  Why did you ask him if he had a search warrant?
 4     A.  I wasn't sure that he had a right to even be
 5  there.  There had been no trouble there, and it was just a
 6  question.
 7     Q.  Well, you testified a moment ago that you
 8  understood he was there to find out if violence or
 9  something unlawful had been done?
10     A.  Uh-huh.
11     Q.  So you understood that at the time, as I
12  understand it?
13     A.  I understood that, yeah, that he would -- that
14  somebody would probably go up to the house and speak with
15  Melodie.
16     Q.  So if you -- if your expectation, as you earlier
17  testified, is that he was there to find out if there had
18  been violence or if something unlawful had taken place, why
19  did you think it necessary to ask him if he needed a search
20  warrant?
21     A.  I'm not sure.  I was intoxicated.
22     Q.  Did you think at the time that a police officer
23  needed a search warrant to go onto property to investigate
24  possible violence or illegal activity ongoing?
25     A.  I had not premeditated or even thought about that,
```

Page 115

```
 1  no.
 2     Q.  And one of the reasons you asked is that you were
 3  intoxicated, is what I understand?
 4     A.  Yeah.  I obviously wasn't thinking too straight.
 5     Q.  Now reading down on to page 3, he asks you
 6  questions, "What happened tonight?"
 7         MR. ROBINSON:  You don't want to go with
 8  "You got a reason to be here" question?
 9         MR. BURKE:  Well, I think we went over that
10  with the search warrant, so I don't feel the need to go
11  over that.
12  BY MR. BURKE:
13     Q.  But I do see him saying to you, "What happened
14  tonight?"  Do you see that?
15     A.  Yeah, I do.
16     Q.  And then there is talk about Melodie, you're not
17  using her name, but it's referring to the fiance or the --
18  as your wife, do you see that?
19     A.  Uh-huh.
20     Q.  And then you tell him, "Nothing."  Do you see that
21  on line 17?
22     A.  Uh-huh.
23     Q.  Why did you say "nothing" in response to his
24  question, "What happened tonight?"
25     A.  Because nothing unlawful or violent had happened.
```

Page 116

```
 1     Q.  But according to -- at least according to Melodie
 2  at the time, at least one violent thing had been your
 3  throwing rocks at the -- her vehicle?
 4     A.  But I had no idea of that.  I had no idea what
 5  Melodie had said.  I knew that nothing unlawful or violent
 6  had happened.
 7     Q.  And do you consider it an act of violence to have
 8  run over the bed back and forth so that she could see it as
 9  she was pulling in?
10     A.  Not at all.
11     Q.  And did you consider it unlawful to be screaming
12  at her telling her to get off the property?
13     A.  No, not at all.
14     Q.  Did you consider it unlawful to be driving in your
15  vehicle on your property when you were intoxicated?
16     A.  No, not at all.
17     Q.  And when he asked the question, "What happened
18  tonight," isn't it true that what had happened tonight up
19  to this point had been you'd taken a bed, you'd put it
20  outside, you'd run over it and you yelled at Melodie?  That
21  had happened, correct?
22     A.  Yes, that had happened.
23     Q.  Why didn't you just tell him about those events
24  and tell him that nothing unlawful had happened?
25         MR. ROBINSON:  Can I lodge an objection
```

Page 117

```
 1  here?
 2         MR. BURKE:  Uh-huh.
 3         MR. ROBINSON:  I'm going to object to this
 4  on the ground that since he has a right, a privilege
 5  against self-incrimination, he doesn't have to speak to
 6  police at all.  So it's irrelevant as to why he did that,
 7  because he has an absolute right to do it, to not say
 8  anything if he would like to.
 9         MR. BURKE:  Well, he did speak to them, so
10         MR. ROBINSON:  But he's in control of how
11  much he wants to speak and how much he doesn't want to
12  speak, that's his absolute right.
13         MR. BURKE:  Well, I'm not prepared to
14  concede that, but in any event he did speak to him.  So I'm
15  going to ask you about what your responses are.  Unless
16  you're going to tell him not to answer?
17         MR. ROBINSON:  No, no, I'm not going to tell
18  him not to an questions, but I'm going to object to this
19  question as to why he didn't say anything to the police.
20  He doesn't have to talk to the police, and he's in control
21  of how much he wants to say to the police.
22  BY MR. BURKE:
23     Q.  The trooper said to you at the bottom of page 3,
24  he said, "I want to know what happened tonight."  Do you
25  see that?
```

Exhibit ____E____

Page __9__ of __11__

30 (Pages 114 to 117)