**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

DANIEL MAHONEY

                Plaintiff,

      vs.

BRYAN BARLOW, in his individual
capacity, and ANDY DEVEAUX, in his
individual capacity.

                Defendants.

Case No. 3:06-cv-00070-TMB

**ORDER
RE: DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT
BASED ON QUALIFIED IMMUNITY**

## I.   MOTIONS PRESENTED

Plaintiff Daniel Mahoney ("Mahoney") brought this action against Defendants Bryan Barlow and Andy DeVeaux, in their individual capacities, under 42 U.S.C. § 1983, alleging violations of his federal constitutional rights through the use of excessive force, assault and battery, false arrest, and false imprisonment. Defendants move for partial summary judgment based on qualified immunity against all of Barlow's claims, but only for a portion of their actions during the incident at issue. Defendants seek an order that, as a matter of law, qualified immunity bars Plaintiff's claims as they pertain to the Defendants' actions up to and including the point when Barlow declared that Mahoney was "detained." The Defendants also seek an order that the Plaintiff's resistance to the officers' use of force was unlawful. Oral arguments on the Defendants' motions were heard January 29, 2008, and

the motions are ripe for review.  For the reasons stated below, the Court GRANTS the Defendants'

motions for partial summary judgment as to qualified immunity, but DENIES their motions as to the

legality of Plaintiff's resistance to the use of force.

## II. BACKGROUND

On August 7, 2004, Melodie Mahoney made a 911 call to the Homer Police. She reported

that her husband, Daniel Mahoney ("Mahoney"), was in the process of running over her bed with

his pick-up truck in the driveway of their home on Marlea Street, roughly 11 miles outside of Homer.

Melodie, who had just returned home from work, placed the call from inside her locked pickup truck.

While still on the phone with a dispatcher, she stated that her husband had begun beating on her

truck and throwing rocks at it. She then reported that he had walked away, heading toward a separate

part of their property on McBride Street. Melodie also stated that her husband was drunk and was

wearing a black leather vest, white cowboy hat and black jeans. Asked if he had any access to

weapons, she stated, "[j]ust rocks."

Homer police dispatch contacted Officer Andy DeVeaux and Alaska State Trooper Bryan

Barlow and relayed the details of Melodie's 911 call, including that Plaintiff had "no known access

to any weapons," although he had "throw[n] rocks at the victim who has locked herself in her

vehicle" and was intoxicated. The dispatcher also told the officers that Plaintiff was "on foot heading

towards his – his barn, which is located on McBride."

Barlow and DeVaux drove in separate patrol cars to McBride Street, without stopping to

speak with Melodie. When the officers arrived at the property, Plaintiff stood up from a campfire

gathering and walked toward them. As he approached, Plaintiff had his left arm interlocked with his

daughter, Shellie, and was holding a puppy. Trooper Barlow's tape recorder captured a portion of

2

the exchange that followed.[1] A transcript of the incident up to the point that Barlow's recorder

stopped recording reads as follows:

| | |
|---|---|
| Trooper Barlow: | Hello. Hi. |
| Mr. Mahoney: | (Indiscernible). |
| Trooper Barlow: | How you doing, man? |
| Mr. Mahoney: | What you doing here? |
| Trooper Barlow: | I need to chat with you for a minute. |
| Mr. Mahoney: | Okay. |
| Trooper Barlow: | What was your name? |
| Mr. Mahoney: | Daniel Mahoney. |
| Trooper Barlow: | Daniel. I need to chat with you. |
| Mr. Mahoney: | You already know that. |
| Trooper Barlow: | No, I don't know your name. Why . . . |
| Mr. Mahoney: | Yeah, you do. |
| Trooper Barlow: | . . . don't you put the dog down. |
| Mr. Mahoney: | No, I ain't gonna put the dog down. I ain't gonna let . . . |
| Trooper Barlow: | Yeah. |
| Mr. Mahoney: | . . . my daughter off. You guys got a search warrant? |
| Shellie Mahoney: | That's okay. |
| Mr. Mahoney: | You got a reason to be here? |
| Shellie Mahoney: | Everything you can say you can do in front of me (indiscernible). |
| Trooper Barlow: | Okay, what happened tonight? What happened (indiscernible) you and your – your wife or fiancé (indiscernible) house? |
| Mr. Mahoney: | It's my wife. |
| Trooper Barlow: | Your wife? |
| Mr. Mahoney: | Yeah. |
| Trooper Barlow: | Okay. |
| Mr. Mahoney: | Nothing. |
| Trooper Barlow: | So something happened to your wife. You're saying it's your wife. What – what happened out there? |
| Mr. Mahoney: | I'm not here for what – what – what do you need to know, partner? |
| Trooper Barlow: | I want to know what happened tonight. |
| Shellie Mahoney: | What's to know? |

---

[1]According to Trooper Barlow's report of the incident, a digital recorder he was wearing on the outside of his bulletproof vest apparently switched off as the officer grappled with Mahoney while attempting to handcuff him. Barlow's report states that "the recorder must have been bumped during the physical altercation with Daniel and the recording ended." The report further states that "[o]nce Daniel was under control" Barlow noticed that a red light that indicates a recording is in progress was not illuminated, and "immediately turned it back on so that the contact was again being recorded."

| | |
|---|---|
| Mr. Mahoney: | I'm not gonna tell you anything. |
| Shellie Mahoney: | Officer . . . |
| Mr. Mahoney: | What do you need to know? |
| Trooper Barlow: | Okay, right now – right now you're detained. |
| Mr. Mahoney: | This is my place. |
| Trooper Barlow: | Put the dog down. |
| Mr. Mahoney: | You got – do you have a warrant? |
| Trooper Barlow: | I'm not gonna ask you again. |
| Mr. Mahoney: | No, don't – get your fucking hands . . . |
| Shellie Mahoney: | No, Dad . . . |
| Mr. Mahoney: | . . . off me. |
| Shellie Mahoney: | . . . Dad, don't, don't. |
| (Simultaneous speaking) | |
| Shellie Mahoney: | Get – let me deal with it. Go. Let me . . . |
| (Simultaneous speaking) | |
| Shellie Mahoney: | . . . I'll calm him, I'll calm him, I'll calm him. |
| Officer: | Back off now. |
| Shellie Mahoney: | I will calm him. |
| Officer: | (Indiscernible) now. |
| Shellie Mahoney: | I'll calm him. I'll calm him. |
| Officer: | Do it now. |
| (Simultaneous speaking) | |
| Shellie Mahoney: | I'll calm him. I'll calm him. |
| Daniel Mahoney: | (Indiscernible) go up and look. |
| Shellie Mahoney: | I'll calm him. |
| (Simultaneous speaking) | |
| Shellie Mahoney: | I'll calm him. |
| Daniel Mahoney: | Go up and look. |
| Shellie Mahoney: | Back off, I'll calm him. |
| Officer: | You need to back up. Back up. It's okay. |
| Daniel Mahoney: | Get your hands off me, boy . . . |
| Officer: | (Indiscernible). |
| Shellie Mahoney: | . . . this is my place. |
| Officer: | No, it doesn't work that way. |
| Shellie Mahoney: | Stop. |
| Daniel Mahoney: | Yeah, it does. |
| Shellie Mahoney: | Officer, you are . . . |
| Officer: | Ma'am, you need to back up right now. |
| Shellie Mahoney: | . . . (indiscernible) my fucking dog. My father. |
| (Simultaneous speakers) | |
| Shellie Mahoney: | Don't – stop it! |
| (Simultaneous speakers) | |
| Shellie Mahoney: | No, my mother is irate. My mother is intoxicated. |

| | |
|---|---|
| Daniel Mahoney: | Hey, hey, wait. |
| Shellie Mahoney: | No, stop. |
| Daniel Mahoney: | She's intoxicated, go look at her. |
| Shellie Mahoney: | She's severely intox – Dad . . . |

During this exchange, Barlow and DeVeaux attempted to handcuff Mahoney. According to Mahoney, Barlow and DeVeaux "attacked [him], grabbing [his] arms and scaring the hell out of [him]."[2] Mahoney resisted by pinning his arms to his waist and telling the officers they were going to hurt his shoulder. Barlow sprayed Mahoney with pepper spray, forcing Mahoney to his knees. Both officers then allegedly jumped on Mahoney's back with their knees and struck the back of his head with their fists. As the officers yanked his arms behind his back, his left shoulder became dislocated. The officers then lifted Mahoney by his handcuffed arms and placed him in one of their patrol cars. DeVeaux stayed with Mahoney as Barlow left to speak with Melodie at the couple's home on Marlea Street. Mahoney was later treated at South Peninsula Hospital for his shoulder and then booked into the Homer city jail on charges of assault in the fourth degree (two counts), disorderly conduct, and resisting or interfering with an arrest. The charges against Mahoney were later dismissed and he was never prosecuted in connection with the August 7, 2004 incident.

On March 31, 2006, Mahoney filed a complaint in U.S. District Court for the District of Alaska, alleging violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. Mahoney's complaint asserts claims of excessive force /assault and battery and false arrest against Barlow and DeVeaux, false imprisonment against DeVeaux, and "illegal actions" including arrest, imprisonment and excessive force against the city

---

[2]Because the troopers' have moved for summary judgment based on qualified immunity, we present the facts in the light most favorable to Mahoney. *Winterrowd v. Nelson*, 480 F.3d 1181, 1183 n.3 (9th Cir. 2007). A jury will have to resolve the parties' conflicting versions as to what happened after the defendants made the decision to detain Mahoney.

of Homer. On February 5, 2008, the Court granted the parties' stipulation to the dismissal of all claims against the city of Homer pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

This Court has original jurisdiction, pursuant to 28 U.S.C. § 1331, over plaintiff's claims brought under 42 U.S.C. § 1983.

### III. DISCUSSION

**A. Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted only when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that material facts are not genuinely disputed.[3] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[4] Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.[5] In assessing a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[6]

---

[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[4] *Id*. at 325.

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[6] *Id*. at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

**B. Did the Detainment and Handcuffing of Mahoney Violate His Federal Constitutional Rights?**

Barlow and DeVeaux have moved for partial summary judgment, based on qualified immunity, with regard to the decision to detain and handcuff Mahoney. They seek an order that, as a matter of law, qualified immunity bars Mahoney's false arrest, false imprisonment, and 42 U.S.C. § 1983 claims as they pertain to their actions up to and including the point of detention and handcuffing. The parties agreed at oral argument that Mahoney's excessive force claim is not appropriate for summary judgment

Qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[7] In *Saucier v. Katz*, the Supreme Court established a two-step analysis for qualified immunity claims.[8] First, a court must determine whether the alleged facts, viewed in the light most favorable to the nonmoving party, show that the officer's conduct violated a constitutional right. If the court determines that the alleged conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity. If a violation occurred, the court must then determine whether the violated right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[9]

Mahoney's claims center on the Fourth Amendment guarantee that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

---

[7]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[8]533 U.S. 194, 201 (2001).

[9]*Menotti v. City of Seattle*, 409 F.3d 1113, 1152 (9th Cir. 2005) (quoting *Saucier*, 533 U.S. at 201-02).

7

shall not be violated."[10] We thus analyze the type of seizure or detention at issue in this case and whether it was supported by adequate justification.

### 1. Was the detention and handcuffing of Mahoney a valid investigatory stop or a de facto arrest?

It is undisputed that the Defendants' detention of Plaintiff constituted a seizure for Fourth Amendment purposes, "as a reasonable person in his situation would not have felt free 'to disregard the police and go about his business.'"[11] At issue here is whether plaintiff's detention ripened into an arrest based on the circumstances. "There is no bright-line rule to determine when an investigatory stop becomes an arrest."[12] Rather, to determine whether a detention constitutes an arrest, courts must consider the "totality of the circumstances," including "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted . . . and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken."[13] In sum, courts must evaluate "not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*."[14] Because of this, the Ninth Circuit has held that although certain police actions constitute an arrest under certain circumstances, the "*same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a

---

[10]U.S. Const. amend. IV.

[11]*Gallegos v. City of Los Angeles,* 308 F.3d 987, 990 (9th Cir. 2002) (quoting *California v. Hodari*, 499 U.S. 621, 628 (1991)).

[12]Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).

[13]*Id*.

[14]*Id*.

8

serious threat to the safety of the officers exists."[15] The appropriate inquiry is "always one of reasonableness under the circumstances."[16]

In weighing the severity of the intrusion and the aggressiveness of the police action, the Ninth Circuit has stated that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop."[17] In *Washington v. Lambert*, the Ninth Circuit set forth special circumstances that can justify the use of "especially intrusive means of effecting a stop." These circumstances include:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur.[18]

Defendants argue that the detention of Mahoney amounted to an investigative stop and was supported by reasonable suspicion that Mahoney had committed a crime of domestic violence. They contend that the handcuffing, in particular, was justified by Mahoney's uncooperative, agitated, confrontational, and intoxicated demeanor when they confronted him. While Barlow does not expressly rely upon the *Lambert* factors, he asserts that the inflection in Mahoney's voice and his body language were confrontational and that Mahoney offered uncooperative verbal responses to the officers' initial questions. DeVeaux does rely on *Lambert*, arguing that the decision to handcuff

---

[15]*Id.* at 1185.

[16]*Id.* (quoting *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995)).

[17]*Id.* at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

[18]*Id.* at 1189 (citations omitted).

Mahoney was supported by the first and third circumstances.[19] Echoing Barlow, he asserts that Mahoney was uncooperative because he refused orders to put down the puppy he was holding and lied to the officers by stating "Nothing," when asked what had happened earlier that night. DeVeaux further argues that Mahoney's behavior suggested a reasonable possibility that he might become violent. Without pointing to specific evidence, DeVeaux describes Mahoney as "drunk, agitated, and confrontational with the officers" and notes that before their arrival Mahoney had allegedly committed "several acts of violence."

Mahoney responds that the physical force used by the officers was so intrusive that the detention must be classified as an arrest. He challenges the Defendants' assertions that the detention and handcuffing were justified by safety concerns, noting that he never threatened nor cursed at either officer. He also points out that police dispatch told the officers that Daniel was unarmed, except for rocks. He further contends that the alleged crime reported by Melodie Mahoney amounted to a "minor incident" of criminal mischief and did not create an imminent public danger. Finally, despite the officers' claims that he was agitated and uncooperative, he testified at his deposition that he had "calmed down" and was "happy" by the time the officers arrived.

As noted above, the summary judgment stage requires the Court to view facts in the light most favorable to the nonmoving party when there is a genuine dispute as to material facts. However, as the Defendants point out, where the record includes a recording that "blatantly contradict[s]" the nonmoving party's version of events, so that no reasonable jury could believe it, the Court need not

---

[19]*Id.*

adopt the party's version of the facts for purposes of ruling on a summary judgment motion.[20]

Here, the partial audio recording of the initial encounter between Plaintiff and the Defendants contradicts Mahoney's assertions during his deposition that he had "calmed down" and was "happy" by the time the Defendants contacted him. Rather, the audio recording, brief as it is, supports the Defendants' view that Plaintiff was uncooperative and agitated when they arrived. Although less than a minute elapsed between the Defendants' initial encounter with Mahoney and Barlow's statement, "Okay, right now – right now you're detained," Mahoney twice refused to answer Barlow's questions about the events involving Melodie Mahoney and refused Barlow's request to put the puppy down during that time period. A transcript of the recording – the accuracy of which has not been disputed – shows that Mahoney stated, "No, I ain't gonna put the dog down. I ain't gonna let . . . " when asked to put the puppy down. Then, when asked, "Okay, what happened tonight?" he offered the following replies in quick succession: "Nothing," "I'm not here for what – what – what do you need to know, partner," and "I'm not gonna tell you anything." These responses show that the Plaintiff was uncooperative when the officers initially approached him.

Whether Mahoney took action at the scene that raised a possibility of danger is a closer call, given the brevity of the initial encounter. The Court is mindful that the circumstances under which the detention occurred heightened the risk faced by the officers; the Mahoneys' property was roughly 11 miles outside of Homer and the officers knew  they were responding to a 911 call involving an intoxicated husband who had allegedly destroyed property and thrown rocks at his wife as she sat in her truck. In addition, the audio recording reflects that both Mahoney and his daughter, with whom

---

[20]*Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007) (holding that in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape which captured events underlying excessive force claim).

his arm was interlocked, were agitated during the brief encounter and, at times, Mahoney was incoherent prior to the handcuffing.[21] His agitation is reflected in his initial response to Barlow's presence when Mahoney asks, "You guys got a search warrant?" and "I'm not gonna tell you anything." Yet when the evidence is viewed in the light most favorable to Mahoney, the record cannot support Barlow's assertion that Mahoney's actions after the officers arrived showed "the potential to explode or become violent or start fighting with people." Despite his intoxication, Mahoney denies that he acted aggressively toward the officers and points out that he never threatened them nor acted violently before they attempted to handcuff him. Mahoney further notes that Homer dispatch expressly told the officers that Mahoney did not have access to any weapons, except for rocks. Given this, the evidence, on summary judgment, is not sufficient to conclude that Mahoney's actions at the scene raised a reasonable possibility of danger.

As for the third *Lambert* factor, the undisputed evidence shows that police dispatch informed the officers that Mahoney "did throw rocks at the victim who has locked herself in her vehicle . . . " The Defendants could reasonably have interpreted this as a report of domestic violence, despite Mahoney's contention that the alleged crime, in hindsight, amounted to a "minor incident" of criminal mischief.

While the Court is concerned that the encounter progressed to a detainment and handcuffing so quickly after it began, the summary judgment record justifies the use of "especially intrusive" means under the circumstances. The facts, viewed in the light most favorable to Mahoney, show that

---

[21]The Court need not consider whether Mahoney's actions at the scene posed a reasonable possibility of flight – a justification for the use of "intrusive means" of effecting an investigative stop under *Lambert*. Neither defendant has alleged this ground in support of their summary judgment motions.

he was uncooperative and that the Defendants had a reasonable basis for believing a violent crime

had occurred shortly before their arrival. That the evidence is not sufficient to show, on summary

judgment, that Mahoney's actions at the scene posed a threat to the officers does not negate the

Court's conclusion. The phrasing of the first *Lambert* factor – "where the suspect is uncooperative

*or* takes action at the scene that raises a reasonable possibility of danger or flight"[22] – suggests that

uncooperativeness alone, or uncooperativeness and a reasonable belief that a violent crime had

occurred, can justify the use of intrusive means to effect an investigative stop.

> **2. Did the Defendants have reasonable suspicion to stop Plaintiff when they decided to detain and handcuff him?**

We next turn to the question of whether Defendants had reasonable suspicion to support

Mahoney's detention. Under *Terry* and its progeny, a valid investigative stop must be supported by

reasonable suspicion that a suspect is involved in criminal activity.[23] Reasonable suspicion is formed

by "specific articulable facts which, together with objective and reasonable inferences, form the basis

for suspecting that the particular person detained is engaged in criminal activity."[24]

In the instant case, Defendants had a sufficient basis for suspecting Mahoney committed the

alleged crime reported by Melodie Mahoney and relayed to the officers by police dispatch. The

details of Melodie's Mahoney's 911 call were supported by the officers' observations that Mahoney

was intoxicated, dressed as described and located on the McBride property. In addition, reasonable

suspicion is supported by the inconsistent answers given by Mahoney in response to Barlow's

---

[22]*Lambert*, 98 F.3d at 1189 (emphasis added).

[23]*U.S. v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002).

[24]*Id*. (quoting *United States. v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

questions about what happened that night. Mahoney's answers included: "Nothing," "I'm not here for what – what - what do you need to know, partner?" and "I'm not gonna tell you anything."

Based on the evidence in the record, the court concludes that the detention of Mahoney was a valid investigative stop supported by reasonable suspicion, and thus did not violate Mahoney's Fourth Amendment rights. Given this conclusion, the Defendants are entitled to qualified immunity for their actions up to the point at which Barlow stated, "Okay, right now – right now you're detained" and decided to use handcuffs to effect the stop.

### C. Mahoney's Resistance to the Detention

In addition to seeking qualified immunity, Defendants have asked the Court to rule that Mahoney's resistance to the officers' efforts to detain and handcuff him was illegal as a matter of law. Through this, they seek to narrow the triable issues to a single claim: whether the Defendants used reasonable force in overcoming Plaintiff's resistance.

But the lawfulness of Plaintiff's resistance is tied to the issue of whether the Defendants used excessive force in detaining him, making the Defendants' motion on this issue inappropriate for summary judgment. Under Alaska law, a person generally has no right to use force to resist an identified police officer who is attempting to detain that person at the scene of an investigative stop.[25] However, AS 11.81.400 specifically recognizes an exception to this rule where "the force used by the peace officer exceeds that allowed under AS 11.81.370." In turn, AS 11.81.370 authorizes the use of force only "to the extent the officer reasonably believes it necessary to make an arrest, to

---

[25]*Melson v. Muni. of Anchorage*, 60 P.3d 199, 201 (Alaska Ct. App. 2002); *See also* AS 11.81.400.

14

terminate an escape or attempted escape from custody, *or to make a lawful stop*."[26] In the instant case, Plaintiff and the Defendants have offered starkly different accounts of their actions in connection with the handcuffing, use of pepper spray and physical altercation that followed Barlow's decision to detain the Plaintiff, thus creating triable issues of fact as to the lawfulness of the Defendants' use of force and Plaintiff's resistance to their efforts.

## IV. CONCLUSION

For the reasons set out above, Defendants' Motions for Summary Judgment at Docket Nos. 25 and 52 are GRANTED with respect to the Plaintiff's claims, but only as to the Defendants' actions up to the point at which Barlow made the decision to detain and handcuff the Plaintiff. The Defendants' Motions are DENIED as to their request for a ruling that Plaintiff's resistance to the detention was unlawful.

Dated at Anchorage, Alaska, this 26th day of March 2008.

/s/ Timothy Burgess
TIMOTHY M. BURGESS
U. S. DISTRICT JUDGE

---

[26]AS 11.81.370 (emphasis added); *See also Gray v. State*, 463 P.2d 897, 907-09 (Alaska 1970) (recognizing that an arrestee retains the right to resist officers who use excessive force).